UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
AMEILA ESPOSITO,

**MEMORANDUM AND ORDER**
09 CV 0421 (DRH) (GRB)

- against -

LARA QUATINEZ, M.D., personally; LAURA
FOCHTMANN, M.D., personally; JUDITH ARNOLD,
R.N., personally; and SUFFOLK COUNTY,

Defendants.
------------------------------------------------------------------X
**APPEARANCES:**

**Civil Rights Clinic**
**Touro College**
**Jacob D. Fuchsberg Law Center**
Attorneys for Plaintiff
225 Eastview Drive
Central Islip, NY 11722
BY:   Michelle K. Caldera, Esq.
      William M. Brooks, Esq.
      Melissa Beth Greenberger, Esq.

**NYS Attorney General**
Attorneys for Defendant Lara Quatinez
300 Motor Parkway
Suite 205
Happauge, NY 11788
BY:   Terrance K. DeRosa, Esq.

**Simmons Jannace, LLP**
Attorneys for Defendant Laura Fochtmann
75 Jackson Avenue
Syosset, NY 11791
BY:   Steven D. Jannace, Esq.

**HURLEY, Senior District Judge:**

Plaintiff Amelia Esposito ("plaintiff" or "Esposito") was involuntarily committed the psychiatric unit of Stony Brook University Hospital ("SBUH") from February 2, 2008 to March 6, 2008 pursuant to New York State Mental Hygiene Law ("MHL"). During her hospitalization, plaintiff received care from attending physician Dr. Laura Fochtmann ("Fochtmann") as well as Dr. Lara Quatinez ("Quatinez"), (collectively "defendants"[1]).

On October 13, 2010, plaintiff filed a Third Amended Complaint ("Amend. Compl."), the operative pleading in this action, bringing the following claims pursuant to 42 U.S.C. § 1983: (1) that defendant Quatinez, M.D. violated the plaintiff's right to liberty under the Due Process Clause of the Fourteenth Amendment "[b]y causing forcible restraint of the plaintiff without considering less restrictive alternatives, and when the plaintiff was not causing an emergency;" (2) that defendant Fochtmann violated the plaintiff's right to religious freedom pursuant to the First Amendment "[b]y refusing to transfer the plaintiff to a hospital where abortions were not performed;" (3) that defendant Quatinez committed assault and battery on the plaintiff "[b]y authorizing the forcible restraint of the plaintiff when plaintiff was not posing a danger to herself or others, and was not creating an emergency within the hospital setting."

Presently before the Court is defendant Fochtman's motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56 seeking to dismiss plaintiff's First Amendment claim and defendant Quatinez's Rule 56 motion seeking to dismiss plaintiff's Due

---

[1] Although there were originally four defendants, Plaintiff's claims against SBUH have been settled, (Notice of Acceptance with Offer of Judgment, dated Mar. 13, 2012, D.E. 49), and any claims originally brought against Judith Arnold, a nurse at SBUH, have been withdrawn. (Pl.'s Mem. in Opp'n at 2, n.1.)

Process and assault and battery claims.    For the reasons set forth below, both motions are

denied.

***BACKGROUND***[2]

The following material facts are drawn from the parties' Local Civil Rule 56.1

Statements and evidentiary submissions and are undisputed unless otherwise noted.

On February 1, 2008, Esposito had a dispute with Dawn Rizzo, the property manager of

the assisted living community[3]  where plaintiff resided, concerning plaintiff's smoking in the

facility's community room against property rules.    Following the dispute, which plaintiff

characterizes as verbal and "not at all" physical, (Esposito Dep. at 30-31), the Suffolk County

Police Department arrived on the scene and took plaintiff to Stony Brook University Hospital

("SBUH"), where she was evaluated in the Comprehensive Psychiatric Emergency Program

("CPEP") and involuntarily admitted that same day.    Plaintiff was placed in the Acute Inpatient

Unit on floor 10N for bipolar disorder.    Although the hospital records state that plaintiff

presented grandiose behavior, religious preoccupation and paranoia, plaintiff disputes that she

was in need of hospitalization.    Dr. Laura Fochtmann was plaintiff's attending psychiatrist from

February 2, 2008 until February 22, 2008.

It is undisputed that throughout plaintiff's hospitalization at SBUH, she stated that she

wanted to be released or transferred to a hospital that did not perform abortions.    Defendant

---

[2]  While the facts presented in this Section are for purposes of the defendant Fochtmann's
motion for summary judgment, there is overlap with those facts relevant to defendant Quatinez's
motion for summary judgment.    To the extent that additional facts are relied on in connection
with Quatinez's motion, those facts will be addressed *infra*.

[3]  Plaintiff asserts that she resided in a "senior citizens' housing complex."    (Esposito
Decl. ¶ 3.)

Fochtmann, however, disputes that plaintiff told her or Dr. Kuruvilla, a resident physician, that the reason for her request for a transfer was rooted in her religious beliefs. In addition, defendant Fochtmann disputes that plaintiff had personal knowledge as to whether abortions were being performed at SBUH, although plaintiff claims that she learned that abortions were being performed at SBUH through her involvement with the Right to Life Committee. (Esposito Decl. ¶ 9-10.) It is SBUH policy that patients may request a transfer to another hospital, and SBUH instructs patients to contact the hospital to which they wish to transfer to see if the hospital has any available beds. If the requested facility has an available bed, it can issue an order of transfer that allows SBUH to transfer the patient to the requested facility.

In this case, Dr. Kuruvilla told plaintiff to contact St. Catherine's Hospital to assure that space was available to accommodate plaintiff's transfer. Plaintiff called St. Catherine's Hospital. Initially, St Catherine's told plaintiff that there were no beds available to accommodate her. Plaintiff claims, however, that later in the conversation the person she spoke with told her that a bed was available if someone from SBUH called and requested one. (Esposito Decl. ¶ 17.) Plaintiff contends that she told Fochtmann's associate about her conversation and requested that she take steps to facilitate the transfer, however, nothing was done. (*Id*. at 18.)

It is undisputed that during plaintiff's hospitalization, she was permitted to see visitors from her church, and plaintiff prayed, discussed the Bible, and read scriptures with her friends. In general, SBUH provides patients with opportunities to practice their chosen religions through in-house or visiting clergy, religious ceremonies performed by those clergy, and Bibles provided by the hospital.

***DISCUSSION***

**I.**        <u>**Summary Judgment Standard**</u>

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact and one party's entitlement to judgment as a matter of law.   *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994).   The relevant governing law in each case determines which facts are material; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248.   No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor.   *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried.   *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996).   The non-movant must present more than a "scintilla of evidence," *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in his or her pleadings, on

5

conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citations omitted). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., LP*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The district court, in considering a summary judgment motion, must also be mindful of the underlying burdens of proof because "the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, "the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the" non-movant's claim. *Id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to present sufficient evidence in support of his claim, the burden shifts to the non-movant to offer "persuasive evidence that his claim is not 'implausible.' " *Id.* at 211 (citing *Matsushita*, 475 U.S. at 587).

## II.   *§ 1983*

42 U.S.C. § 1983 provides, in relevant part, that "[e]very person who, under color of [state law] subjects, or causes to be subjected, any . . . person within the jurisdiction [of the United States] to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law [or a] suit in

equity . . . ."   To assert a § 1983 claim, a plaintiff must prove that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylag,* 188 F.3d 51, 53 (2d Cir. 1999) (citation omitted); *Sybalski v. Indep. Grp. Home Living Program, Inc.,* 546 F.3d 255, 257 (2d Cir.2008).   Neither defendant in this case asserts that they did not act under color of state law, but both defendants challenge whether their conduct deprived plaintiff of a constitutionally protected right.

### III.   *Defendant Fochtmann's Motion for Summary Judgment on Plaintiff's Free Exercise Claim*

Plaintiff claims that "[r]equiring the plaintiff to remain hospitalized at Stony Brook violated her right to the free exercise of religion" as her "religious beliefs dictated that she not affiliate herself by means of the receipt of treatment with a hospital that performed abortions." (Pl.'s Mem. in Opp'n at 5.)   Defendant Fochtmann argues in response that "plaintiff has not provided any testimony or evidence to support that Dr. Fochtmann infringed upon her free exercise of her religious beliefs."   (Def.'s Mem. in Supp. at 8.)   The Court disagrees with defendant.

"The Free Exercise Clause of the First Amendment, which has been applied to the states through the Fourteenth Amendment, provides that Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. " *Fifth Ave. Presbyterian Church v. City of New York,* 293 F.3d 570, 574 (2d Cir.2002) (internal quotation marks and citations omitted).   The amendment protects against "governmental compulsion either to do or

refrain from doing an act forbidden or required by one's religion, or to affirm or disavow a belief forbidden or required by one's religion." *McChesney v. Hogan*, 2012 WL 3686083, at *13 (N.D.N.Y. Jul. 30, 2012) (citing *Mozert v. Hawkins Cty. Bd. Of Educ.*, 827 F.2d 1058, 1066 (6th Cir. 1987)).

"Because '[t]he free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires,' courts are not permitted to inquire into the centrality of a professed belief to the adherent's religion or to question its validity in determining whether a religious practice exists." *Fifth Ave. Presbyterian Church*, 293 F.3d at 573 (citing *Employment Div., Dep't of Human Resources of Oregon v. Smith*, 494 U.S. 872, 886-87 (1990)). "An individual claiming violation of free exercise rights need only demonstrate that the beliefs professed are sincerely held and in the individual's own scheme of things, religious." *Id.* (internal quotation marks and citations omitted).

Here, plaintiff has raised a genuine question of fact as to whether her belief that "she not affiliate herself by means of the receipt of treatment with a hospital that performed abortions" was sincerely held. (Pl.'s Mem. in Opp'n at 5.) In her declaration, Ms. Esposito states that "[d]ue to [her] strong religious beliefs and pro-life views, [she] did not want to be admitted to, or hospitalized at, Stony Brook because of the fact that abortions [were] performed there." (Esposito Decl. ¶ 14.) She also states that she told Dr. Fochtmann that her "religious beliefs dictated that [she] not receive treatment at a hospital that performed abortions" and told Dr. Fochtmann that she wanted to be transferred to St. Catherine's Hospital or a Catholic Hospital that did not perform abortions. (*Id.* ¶ 15.)

Furthermore, there is a genuine question of fact as to whether Dr. Fochtmann prevented plaintiff from exercising her belief by failing to transfer her from SBUH to St. Catherine's. Viewing plaintiff's deposition testimony and declaration in the light most favorable to her, plaintiff has presented evidence that she did call St. Catherine's Hospital inquiring about a transfer and was told that there might be availability if someone from SBUH called to inquire. (*See* Esposito Decl. ¶ 17 ("The person with whom I spoke [at St. Catherine's] stated that a bed was available if someone from Stony Brook called."); Esposito Dep. at 139 (stating that the person with whom plaintiff spoke told plaintiff, "we can't give you availability because you're not the hospital, a hospital has to call, have the doctor call")). According to plaintiff, she informed Dr. Fochtmann's associate (presumably Dr. Kuruvilla) of her conversation and requested that someone from SBUH call St. Catherine's to initiate the transfer process, however, no one from SBUH called St. Catherine's and as a result, she was forced to stay at SBUH.[4] (*See* Esposito Decl. ¶¶ 18-19.)

Finally, a reasonable fact finder could conclude that plaintiff's liberty interest outweighed defendant Fochtmann's interest in committing the alleged infringement. "[T]he Supreme Court has established that the individual liberties of [psychiatric patients] must be balanced against the relevant interests of the institution in determining whether a constitutional violation has occurred." *Samuels v. Stone*, 1999 WL 624549, at *3 (S.D.N.Y. Aug. 17, 1999). For

---

[4] Plaintiff has also presented information demonstrating that SBUH performs abortions as she claims that she called the hospital inquiring about obtaining an abortion and that a representative from SBUH asked her the type of insurance she carried and informed her that she would be able to obtain an abortion. (*See* Esposito Dep. at 201-204; Esposito Decl. ¶ 10.) Such information is presumably not hearsay under Fed. R. Evid. 801(d)(2)(D).

example, in *Youngberg v. Romeo*, 457 U.S. 307, (1982), the Court ruled that involuntarily committed psychiatric patients have a protected liberty interest under the Fourteenth Amendment to reasonably safe conditions of confinement and freedom from unreasonable bodily restraint." *Id*. The Court stated that in order to determine whether a violation of that right occurred, it must balance "the individual's interest in liberty against the State's asserted reasons for restraining individual liberty." *Id*. at 320-21. Furthermore, the Second Circuit has stated that "the dual goals of involuntary commitment [are] to provide care and treatment to those unable to care for themselves and to protect the individual and society from those who pose a danger to themselves and others because of mental illness." *Goetz v. Crosson*, 967 F.2d 29, 34 (2d Cir. 1992).

Here, whether defendant's interest in protecting both Ms. Esposito and the public justified Dr. Fochtmann's actions is a question of fact to be decided by the trier of fact. Defendant has put forth evidence that a bed was available at St. Catherine's and that Fochtmann refused to transfer plaintiff despite knowing of that availability. A reasonable fact finder could conclude that plaintiff's interest in religious liberty outweighed defendant's interest in treating her at SBUH despite there being a bed available at a hospital whose practices did not conflict with plaintiff's religious beliefs.

For the aforementioned reasons, the Court denies defendant Fochtmann's motion for summary judgment.

**IV.** **_Defendant Quatinez's Motion for Summary Judgment on Plaintiff's Due Process Claim_**

The facts relating to Quatinez's motion for summary judgment concern an incident that occurred while plaintiff was hospitalized at SBUH in the early morning hours of February 10, 2008 during which plaintiff got out of bed to seek a drink of water.   Although defendant asserts that plaintiff kept getting out of bed and leaving her room, plaintiff claims that she simply left her bed and went to the nurse's desk to ask for water.   Hospital records state that plaintiff was being intrusive, loud, refusing to use her walker which was necessary for her to ambulate safely, going in and out of other patients' rooms, and having "aggressive episodes."   Although plaintiff does not dispute that the records contain these findings, she disputes this characterization of her behavior.   (Def.'s Ex. D at 88-89.)

In addition, plaintiff's behavior once at the nurse's station is in dispute.   Defendant Quatinez claims that the medical staff repeatedly attempted to redirect plaintiff appropriately and that at around 5:20 a.m. Quatinez was summoned to the floor to assess plaintiff and concluded that restraints were appropriate because plaintiff was verbally threatening, intrusive, yelling and cursing.   Although plaintiff admits to yelling into the room behind the nurse's desk for water, she contends that she "was not out of control when she yelled," but yelled only so that staff members who were in the room behind the nurse's station could hear her."   According to plaintiff, she returned to her room and waited for someone to bring her water until three security guards and a nurse entered and placed her in restraints on her bed.   Plaintiff contends that Dr. Quatinez never examined her throughout this ordeal as required by MHL § 34.04(d) discussed *infra*.   (Esposito Decl. ¶¶ 25-26.)

Plaintiff was released from restraint after two hours.    Although defendant Quatinez asserts that plaintiff was monitored every fifteen minutes during her time in restraints, plaintiff claims that she was left alone, restrained in the dark, and that the only time a person came into her room was to check on her blood pressure alarm.    (Esposito Decl. ¶ 25.)

*Plaintiff's Claim*

Count one of the Amended Complaint alleges that "[b]y causing the forcible restraint of the plaintiff without considering less restrictive alternatives, and when the plaintiff was not causing an emergency, and when she did not present a physical danger to herself or others, as required by New York Mental Hygiene Law [("MHL")] § 33.04 and [New York Codes, Rules and Regulations,]14 N.Y.C.R.R. § 27.7, defendants . . . violated the plaintiff's right to liberty under the Due Process Clause of the Fourteenth Amendment."    (Amend. Compl. ¶ 52.)

MHL § 33.04(b) provides that "restraint shall be employed only when necessary to prevent a patient from seriously injuring himself or others," and "[i]t may be applied only if less restrictive techniques have been clinically determined to be inappropriate or insufficient to avoid such injury."    In addition, § 33.04(d) states that "[r]estraint shall be effected only by written order of a physician after a personal examination of the patient except in an emergency situation," and "[t]he order shall set forth the facts justifying the restraint and shall specify the nature of the restraint and any conditions for maintaining the restraint."    Furthermore, § 33.04(f) provides that once the patient is restrained "[a]n assessment of the patient's condition shall be made at least once every thirty minutes" and "[t]he assessment shall be recorded and placed in the patient's file."

In addition, 14 N.Y.C.R.R. § 27.7 provides that restraint shall be employed only when absolutely necessary to protect the patient from injuring himself or others and when less restrictive techniques have been clinically determined to be inappropriate or insufficient. In addition, this section states that orders for restraint shall be rewritten daily and only after a personal examination by a physician.

## A.     Violation of Due Process[5]

### Substantive Due Process

The Supreme Court in *Youngberg v. Romeo* proclaimed that an individual has a substantive right to "freedom from bodily restraint."    457 U.S. at 316; *see also Soc'y for Good Will to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239, 1243 (2d Cir. 1984) (discussing due process rights of mentally retarded individuals in light of *Youngberg*).    In that case, the Court stated that a state institution for the mentally retarded could "not restrain residents except when and to the extent professional judgment deems this necessary to assure . . . safety or to provide needed training."    *Id*. at 324.

---

[5]  Plaintiff's failure to explicitly state either in the complaint or in her brief whether she claims a violation of procedural due process, substantive due process, or both complicates the issues here.    From a close reading of plaintiff's papers, the Court infers that plaintiff asserts both violations.    As a result, the Court has asserted considerable effort in parsing out these two claims from plaintiff's submission and is guided by *Demarco v. Sadiker et al.*, 897 F. Supp. 693 (E.D.N.Y. 1995), *rev'd on other grounds* 199 F.3d 1321 (2d Cir. 1999).    In that case, involving a due process violation in the involuntary commitment context, the court noted that "to have been afforded procedural due process means to have been given the benefit of procedural safeguards to reduce the chance of an erroneous commitment" and that "[t]o have been afforded substantive due process means not to have been committed if one was not dangerous."    *Id*. at 699; *see also Rodriguez v. City of N.Y.*, 72 F.3d 1051, 1061 ("As a substantive matter, due process does not permit the involuntary hospitalization of a person who is not a danger either to herself or to others . . . .")

Here, plaintiff claims that "questions of fact exist as to whether placement of the plaintiff in restraint [was]necessary to keep the plaintiff from injuring herself or others." (Pl's Mem. in Opp'n at 8.) According to defendant, the hospital medical records describing plaintiff as loud and aggressive demonstrate that plaintiff posed a danger to herself and others. The Court concludes, however, that viewing the facts in the light most favorable to plaintiff, a reasonable trier of fact could conclude that plaintiff was not dangerous. According to plaintiff, after she communicated with staff regarding her request for water, she "simply went back to her room and waited for staff to bring her water," and did not "threaten physical harm or act in a way that could cause harm to others." (Pl.'s Mem. in Opp'n at 8-9; *See* Esposito Decl. ¶ 25.) In addition, "she was a debilitated sixty-year-old woman who needed a walker to ambulate." (Pl.'s Mem. in Opp'n. at 9.) Based on these disputed facts, defendant has not met its burden in demonstrating that "no reasonable jury could conclude based upon the undisputed facts that this plaintiff did not pose a threat of harm to [her]self or others." *Demarco v. Sadiker et al.*, 897 F. Supp. 693, 704 (E.D.N.Y. 1995), *rev'd on other grounds* 199 F.3d 1321 (2d Cir. 1999). As a result, plaintiff's substantive due process claim survives.

Despite defendant's position, the Court's holding in *Youngberg* does not compel a contrary conclusion. Although *Youngberg* states that "decisions made by the appropriate professional are entitled to a presumption of correctness," *Youngberg* also makes clear that "liability may be imposed" if the person responsible for the decision "did not base the decision" on "accepted professional judgment, practice, or standards." *Youngberg*, 457 U.S. at 323-25. Here, the Court cannot hold as a matter of law that Quatinez acted in accordance with professional standards when

he ordered plaintiff's restraint, especially if as plaintiff alleges he did not examine her in

accordance with MHL.   *See M.H. v. Bristol Bd. Of Educ.*, 169 F. Supp. 2d 21, 32 (D. Conn. 2001)

(holding that drawing all inferences in favor of the non-moving plaintiff court was unable to make

certain that professional judgment was in fact exercised, especially where court was without

evidence that defendants followed prescribed rules for using restraints).

***Procedural Due Process***

        The basis of plaintiff's procedural due process claim seems to be that Dr. Quatinez could

not have made a finding of dangerousness because she did not perform the required examination

before restraining the plaintiff as required by MHL § 33.04(d).   That section states that "restraint

shall be effected only by written order of a physician after a personal examination of the patient

except in an emergency situation."   Defendant asserts that the Mental Hygiene Law is

constitutional and ensures that any curtailment on a patient's liberty "complies with the standards

and procedures demanded by the Constitution."   (Def.'s Mem. in Supp. at 5 (citing *Project

Release v. Prevost*, 722 F.2d 960, 971 (2d Cir. 1983)).)   Defendant's sole contention is that Dr.

Quatinez acted in conformance the MHL.[6]

---

[6]  Neither party addresses whether New York's MHL goes above and beyond what federal
procedural due process demands.   Accordingly, the Court will assume that the procedural
protections afforded in the MHL, including a personal examination by a physician, are what is
required here for procedural due process.   Furthermore, with respect to the MHL's requirement
that a doctor personally examine the patient prior to her restraint, in *Demarco*, the court held that
procedural due process required that a doctor examine a patient prior to involuntary confinement
even though the MHL did not explicitly so require it.   *See Demarco*, 897 F. Supp. at 703
("Whether [doctor] performed an examination of plaintiff in which he made the required finding of
dangerousness is a critical, material fact, because if [doctor] confirmed the need for hospitalization
without performing the required examination of plaintiff, that failure to follow the [MHL] would
constitute a due process violation.")   The Court sees no reason why Ms. Esposito should be

Whether Dr. Quatinez performed the required examination is a material fact because Dr. Quatinez's failure to perform the examination prior to restraining plaintiff would violate MHL. Moreover, whether Quatinez performed the examination is genuinely disputed. Although defendants have offered the restraint order signed by doctor Quatinez, (Def.'s Ex. D at 54) as evidence that Quatinez did examine plaintiff, this order does not state definitively that Quatinez performed an examination. In fact, Quatinez herself does not recall her "role in placing restraints on Ms. Esposito." (Quatinez Dep. at 37.) Furthermore, plaintiff's sworn statement denying Quatinez's examination is enough to withstand the motion for summary judgment. Although defendant argues that plaintiff's testimony is "too incredible to be accepted by reasonable minds," (Def.'s Mem. in Supp. at 7), "it is not too incredible to believe that in the hectic atmosphere of a busy mental health institution a doctor might 'rubber-stamp,' . . . the [restraint] of a patient based upon the observations of others." *Demarco*, 897 F. Supp. at 703.

**B.    *Qualified Immunity***

The factual disputes at issue at this stage also prevent the Court from finding as a matter of law that Quatinez is entitled to qualified immunity. "Government actors have qualified immunity to § 1983 claims 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Bolmer v. Oliveira,* 594 F.3d 134, 141 (2d Cir.2010) (quoting *Okin v. Vill. of Cornwall–on–Hudson Police Dep't,* 577 F.3d 415, 432 (2d Cir.2009)). Thus, "[a] qualified immunity defense is established if (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for

---

entitled to less procedural protections than a plaintiff who makes an involuntary confinement challenge.

the defendant to believe that his action did not violate such law." *Salim v. Proulx,* 93 F.3d 86, 89 (2d Cir.1996).

"Qualified immunity shields government officials from liability for civil damages as a result of their performance of discretionary functions, and serves to protect government officials from the burdens of costly, but insubstantial, lawsuits." *Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995).   A court may grant summary judgment on qualified immunity grounds "if [the movant] adduces sufficient facts such that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the [movant] to believe that he was acting in a fashion that did not clearly violate an established federally protected right."   *Hartline v. Gallo,* 546 F.3d 95, 102 (2d Cir. 2008) (citation and internal quotation marks omitted).   Qualified immunity is an affirmative defense.   As such, the burden of proof rests on the defendants asserting the defense to demonstrate that it was objectively reasonable to believe that their conduct did violate a federal right of Plaintiffs.   *See Green v. City of New York,* 465 F.3d 65, 83 (2d Cir. 2006).

As discussed above, the Supreme Court made clear in *Youngberg* that mentally ill individuals have a right to be free from bodily restraint except in situations where professional judgment deems restraint necessary to assure the patient's safety or the safety of others.   Thus, regarding plaintiff's substantive due process claim, whether qualified immunity is appropriate turns on whether it was objectively reasonable for Quatinez to believe at the time she ordered the restraint that plaintiff was dangerous.   *See Glass v. Mayas*, 984 F.2d 55, 57 (2d Cir. 1993).

Viewing the facts in the light most favorable to the plaintiff, there exist questions of fact as to whether it was objectively reasonable for Quatinez to believe that plaintiff was dangerous. In particular, plaintiff's allegation that Quatinez did not examine her draws into the question whether it was reasonable for him to conclude that restraints were necessary to prevent harm. *See Demarco*, 897 F. Supp. at 709 ("The substantive due process claim also remains open because it cannot be determined whether it was objectively reasonable for [the doctor] to conclude that plaintiff was dangerous until it is known how [he] reached that conclusion."); *see also Demarco*, 199 F.3d 1321 (holding that it would have been objectively unreasonable for doctor to admit patient based on a grossly insufficient examination). Therefore, the Court cannot determine at this stage whether Quatinez is entitled to qualified immunity and plaintiff's substantive due process claim survives.

Quatinez's reliance on *Glass v. Mayas*, 984 F.2d 55 (2d Cir. 1993) does not compel a contrary conclusion. There the Court found that defendants' actions in confining plaintiff were objectively reasonable because defendants relied on two reports labeling plaintiff as a threatening individual with a gun and observations of strange behavior as well as an extensive psychiatric history. In that case, however, there was no dispute as to whether the doctors had examined plaintiff before determining that he was dangerous. Similarly, in *Richardson v. Nassau Cnty. Med. Ctr.*, 840 F. Supp 219 (E.D.N.Y. 1994), another case relied upon by defendant where the court granted qualified immunity, the plaintiff was examined by two doctors before they determined that he was dangerous and should be committed.

Similarly, there is a question of fact as to whether Dr. Quatinez is entitled to qualified immunity on the procedural due process claim. Given that there is a question of fact here as to whether Quatinez examined plaintiff, the Court cannot determine whether it was objectively reasonable for Quatinez to believe that she complied with MHL § 33.04. *See Demarco*, 897 F. Supp. at 709. ("Because it remains a disputed fact whether [the doctor] complied with the statute by personally examining plaintiff, it cannot be determined whether it was objectively reasonable for him to believe that he complied with the statute.")

**C.    *Mens Rea***

Defendant argues that plaintiff has failed to state a constitutional violation because Quatinez's actions amount to at most negligence, and "the due process clause is simply not implicated by negligent acts." (Def.'s Mem. in Supp. at 4.) In response, plaintiff relies on *Demarco* in arguing that "the decision to authorize involuntary hospitalization constituted intentional conduct that the Fourteenth Amendment protected." (Pl.'s Mem in Opp'n at 9.) In *Demarco*, the district court held that "where . . . a plaintiff alleges that he was intentionally committed to a mental hospital without the requisite finding of dangerousness and/or without his actually being dangerous, he has sufficiently plead the *mens rea* requirement of a § 1983 cause of action based upon a due process violation, even if the alleged due process violation could be construed as having occurred as the result of mere negligence." 897 F. Supp. at 702. The Court sees no reason to depart from this standard where a plaintiff claims that she was intentionally restrained, especially where other courts in this circuit have allowed such claims. *See M.H.*, 169 F. Supp. 2d at 30-32 (denying motion for summary judgment on plaintiff's substantive due process

claim based on the use of physical restraints); *Astorino v. Lensink*, 1993 WL 366513, at *11 ( D. Conn. 1993) (denying motion for summary judgment on plaintiff's claim that defendant's use of restraint violated right to due process).

### D.      *Punitive Damages*

In a Section 1983 action against individual defendants, punitive damages may be awarded "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 56 (1983).    Here, plaintiff argues that "questions of fact exist as to whether defendant Quatinez acted with callous indifference to the plaintiff's rights" because Quatinez "restrained plaintiff without waiting to see if the administration of medication would address the concerns of the hospital staff," and "never evaluated the plaintiff prior to authorizing restraint."    (Pl.'s Mem. in Opp'n at 14.)    Defendant offers no response to this argument other than its assertion that Quatinez did in fact evaluate the plaintiff.    Viewing the facts in the light most favorable to the plaintiff, a reasonable trier of fact could find that defendant acted with callous indifference to plaintiff's rights in failing to examine plaintiff, and the Court will not preclude plaintiff from seeking punitive damages at this stage.

### V.      *Quatinez's Motion for Summary Judgment on Plaintiff's Assault and Battery Claims*

To succeed on an assault action under New York law, "a plaintiff must establish that a defendant intentional[ly] plac[ed] ... another person in fear of imminent harmful or offensive contact."    *Sheikh v. City of New York,* 2008 WL 5146645, at *13 (E.D.N.Y. Dec. 5, 2008) (internal quotation marks and citation omitted).    Physical injury is not required.    *See*

*Marriott Corp.,* 243 A.D.2d 406, 407 (1st Dep't 1997) ("[P]hysical injury need not be present for an assault").

"To recover damages for battery, a plaintiff must prove that there was bodily contact, that the contact was offensive, i.e., wrongful under all of the circumstances, and intent to make the contact without the plaintiff's consent." *Higgins v. Hamilton,* 18 A.D.3d 436, 436 (2d Dep't 2005) (citations omitted); *see also Green v. City of N.Y.,* 465 F.3d 65, 86 (2d Cir. 2006) ("New York defines ... 'civil battery [as] an intentional wrongful physical contact with another person without consent.") (quoting *Charkhy v. Altman,* 252 A.D.2d 413, 414 (1st Dep't 1998)). "An offensive contact is one which offends a reasonable sense of personal dignity." New York Pattern Jury Instructions 2d 3:3 (2009) (citations omitted); see also *Campoverde v. Sony Pictures Ent.*, 2002 WL 31163804, at *8 (S.D.N.Y. Sept. 30, 2002) ("The test is what an ordinary person not unduly sensitive would find offensive.") (citations and internal quotation marks omitted). "The intent required for battery is intent to cause a bodily contact that a reasonable person would find offensive." *Armstrong v. Brookdale Univ. Hosp. and Med. Ctr.,* 425 F.3d 126, 134 (2d Cir. 2005) (quoting *Jeffreys v. Griffin,* 1 N.Y.3d 34, n.2 (2003) (quoting *New York Pattern Jury Instructions 2d 3:3 (2003)*)).

Defendant argues that plaintiff's "claim for assault and battery must be dismissed because the record is devoid of any proof of intent with regard to State defendants in acting to place plaintiff in restraints," an essential element of the claim. (Def.'s Mem. in Supp. at 14.) Here, however, it should be left to the trier of fact to determine whether in ordering the restraint defendant intended to place plaintiff in fear of imminent offensive contact and as to whether

defendant intended to cause offensive contact in placing plaintiff in restraints.   Moreover,

whether defendant's conduct was privileged because it was effected pursuant to NY MHL is in

dispute.   Therefore, defendant's motion for summary judgment on these claims is denied.

### *CONCLUSION*

For the reasons set forth above, defendant Fochtmann's and defendant Quatinez's

motions for summary judgment are denied.

*SO ORDERED.*

Dated: Central Islip, New York
          March 5, 2014

_____/s/_____
Denis R. Hurley
Unites States District Judge